We are here now on 4170330. It's People v. Howell for the appellate Bridget Garrity and for the appellate Benjamin Sardinis. You may proceed. Good afternoon, Your Honors. Counsel, you may please report. My name is Bridget Garrity and I represent the attendant of this case, Robert Howell. I will address all three issues in this case and ask you to find, first, that no rational trier of fact could believe the illogical and irrational story of someone who was trying to cover his own crimes. Second, that the trial court erred by allowing a police officer to give an opinion he was unqualified to give in a closely balanced case. And third, that the trial court erred when it allowed irrelevant and prejudicial phone calls to be admitted before the jury without proper foundation. First, the evidence in this case was insufficient. There's no rational trier of fact could believe the irrational story of the eyewitness in this case. His story was not rational. He asked the trier of fact to believe that he carried 110 bills totaling $602 to the corner store to buy a $2 beer. Now, the average person may not have held 110 bills in their hand before, but anyone can infer from holding 20 or 30 $10 bills in their hand that 110 bills stacked up is a huge amount of cash. So he carries this to the corner store, and a man approaches him as he's coming out of the corner store outside the 16th Lounge and asks for either $5 or $10 and takes either $5 or $10 or $62, depending on which version of his story he believes, and splashes him in the face in the course of doing that, but doesn't take the remaining $540 that's in this big wad of cash that he has. The mechanics of that don't really make sense. And obviously the jury didn't believe this because they acquitted him of robbery. Either way, the story's not rational. Either he was a robber who only got $5 or $10. Your Honor, what I mean is the jury didn't believe that he took anything because they acquitted him of the robbery. My question was, if $5 were taken with the use of a knife, would that be a robbery? Yes, sir. Okay, thank you. Either way, the story's not rational. Either he robbed him only of $5, as Your Honor pointed out, or he slashed him in the middle of the afternoon in the middle of the neighborhood for no reason. And we know it's not rational because it's not the truth, which we know from the various inconsistencies in his testimony. First, he gave a timeline that was 90 minutes, but then he said at trial that he only took 25 minutes. As I said before, he told various stories about whether it was $5 or $10 or $62. He gave various explanations for the money. He said it was for his rent, it was from his savings, it was from his unemployment check. The $60 in single-dollar bills was for a strip party that he had attended the night before. But he didn't explain why he would still have that money if it was for a party he'd been to the night before. What happened to the beer that he bought when the thing got dropped, or why no police officer was able to find this beer that he allegedly had. And he said that it happened at his feet lunch, and that he immediately started bleeding and covered his face. That as soon as he was cut, he started squirting blood from his face, and then took off his shirt to cover it. But Officer Waddell, whose role in this case was to try to find Little Mob and Robert Howell, testified that he received a dispatch as he was going through the neighborhood, that this happened by the escape lounge. So he went to the escape lounge, looked all around outside, the parking lot, the sidewalk, didn't see any blood there. And in fact, the state itself didn't believe Mr. Jackson that it happened at Sunday's escape lounge. Because the state argued it happened down at 1-5 South Elton. So I included a map in the reply brief, just because I think it's easier to sort of understand where all these things are. It's on page 7 of the reply brief, and I'm going to go ahead and just cut that and put it there. All of the evidence in this case, Jackson and then Kinnan and Ms. Outlaw, testified that it happened up at that intersection at the top of the map. He said it happened at the escape lounge, which is across the street on Elton, and the other two said it happened across the street at Ms. Outlaw's house on the other side of Elton. But there's no one in this room today who's going to argue that it happened there. Because the state didn't believe their own witness, and is arguing that it happened down at 1-5 South Elton, which is a block away on the map. And they're arguing that based on the testimony of Officer Lewis. But the defense witnesses testified that it was across the street, and that he left blood on the front steps and the front porch of Ms. Outlaw's house. Now, there are several pieces of evidence in this case that were not contested. One, we all agree that Mr. Jackson was injured, and that Mr. Powell was the one who injured him. We all agree that there was blood found on Elton Street. But the other uncontested pieces of evidence were that the police, when they searched Mr. Jackson's home, found a scale with residue that tested positive for foot pain. When he went to the hospital, he had foot pain in the system. And then the police were able to confiscate his $540 in court for civil asset forfeiture. I mean, they met a standard to prove in court that that money was the proceeds from drug sales. None of that was contested, and all of that corroborates Mr. Powell's version of the offense. He presented two witnesses who testified against their own interests. Both of them admitted to drug use, which is in stark contrast to Mr. Jackson. He said, oh, well, someone gave me a pill at the party last night. It must be that. He wouldn't admit to his own cocaine use, despite the fact that he's the one where there was medical evidence that proved that he had been using it. All of this points to the idea that no rational trier of fact could believe Jackson's story, especially in a case where there was compelling evidence from the defense. There was an alternate explanation that was much more rational. And so we are asking the court to find that the evidence was insufficient. Second, I'm also asking the court to find that the trial court erred when it allowed Officer Lewis's improper opinion testimony that the confrontation happened at 105 South Hilton. So he was allowed to testify, quote, from my training and experience as a police officer. The blood we located, where the large quantity was, it wasn't droplets. It was sprayed from the, I would describe it as a spray of blood with blood droplets in it like a fresh tea trough. That's only a few lines of testimony. But if you consider it in the context of the trial as a whole, it's quite significant. His role in this trial was to testify about his investigation activities. Each of the officers who testified had a role. Two of them responded to Mr. Jackson's house. Mr. Officer Lewis responded to identify a crime scene, as he put it. And Officer Waddell was supposed to be looking for the suspect. So he testifies repeatedly that this was the crime scene. He located a crime scene and concluded that the blood there was from a fresh injury or someone had just been cut. The state agrees that he was not an expert. And they are arguing that this was not an expert opinion. But if it is, in fact, a lay opinion, then the court is bound by Rule 701. And it's improper for two reasons. First, Rule 701 only allows opinion when it's not based on scientific, technical, or other specialized knowledge. This opinion was. The officer's own words were, from my training and experience. He's invoking the fact that he's a police officer there and he has special training and experience to come to this conclusion about the blood. And furthermore, the National Academy of Sciences recognizes blood splatter analysis as a specific area that requires scientific knowledge. It requires knowledge of physics and math and wound pathology. This is an area about where you can't give an opinion unless you are qualified as an expert. However, even if this court were to find that it's not based on any kind of specialized or technical knowledge, it was improper because the state is not allowed to elicit an opinion. From a lay witness about something about which the jury would come to their own conclusions based on the evidence before them. And in this case, the jury had a dozen different photos of all of this supposed blood evidence from varying angles and distances, some close up, some farther away. And the jury, if the officer was not actually relying on any kind of expertise, because the jury was just as able to look at those photos and come to their own conclusions rather than trying to rely on what the officer says and what his expertise is. This opinion was improper and it was certainly not harmless beyond a reasonable doubt. It was prejudicial in this case. As I explained more fully in my reply brief, the evidence, the blood evidence that he was testifying about was equally consistent with both versions of this incident. So the only blood that they found was at this location of 105 South Hilton and then leading south to the alley right north of the Sherman Hills. There was no blood found between the entrance to that alley and Mr. Jackson's house, which if you look at the map, is a fairly long distance. I don't want to get into quantifying those numbers, but certainly it's about as long as the distance between 105 South Hilton. Didn't the officer testify that by far and away the most blood found was at the 105 South Hilton Street area? He did, yes. Well, doesn't that carry some significance? Couldn't a jury draw an inference? Therefore, that's where the assault occurred? I suppose it's possible the jury could, but there shouldn't have been influence by his expert opinion about it. They should have been allowed to come to that conclusion on their own without something they knew they were going to come to. And that's not an inevitable conclusion in this case because the evidence was as consistent with both sides of the story. He said that he started bleeding immediately and then covered his face. Well, we know from the area between 105 South Hilton and his house that he was able to contain the blood and not drip it all over the place because there was no blood found there. And so he just as easily could have been injured at his outlaw's house, covered himself up, walked along, stopped, because he said he talked to a friend along the way, maybe he was showing the friend that he knew or something, but he very easily could have moved to adjust the shirt or something, some lead on the sidewalk, and then covered himself back up and kept going, which would explain to him why there's more blood found at his house. And the officers testified that when they encountered him at his house, he wasn't, you know, he was kind of covered up and then when he moved the shirt, then the blood came out. So that's consistent with him kind of stopping at that location. And the state argued directly in closing that this officer's opinion was sort of proof that that's where it happened. The state asked the jury, how did he, referring to Lewis, describe it, referring to the blood? It looks like spray. It looks like Lewis Jackson gets cut, starts spraying blood to his face, then his blood changes according to Officer Lewis. So they're invoking his expertise here to say this is where it happened. So in addition to that and proper evidence, those before the jury, the state also used recordings of jail filming calls. And my third argument is that the trial court erred and then allowed the state to play those recordings for the jury, because they were irrelevant, they were more prejudicial than probative, and they lacked a proper foundation. So starting with relevance. The relevance of these recordings comes from a presumption that Mr. Howell is guilty. If we presume that he's guilty, it's a lot easier to infer that what he's talking about in these calls is an attempted, intimidated witness. But if we start where we're supposed to, and presume that he's innocent, the calls don't really mean very much. Now, the state can't point to a specific statement or plan that indicates that he was trying to intimidate Mr. Jackson. I would be surprised if the state got up and argued that they would have enough evidence here to prosecute him for witness intimidation. Because there's simply nothing here. What the state points to is four things. It said that he repeatedly asked the various people he called to handle the business before his trial date. Number two, that he was informing them that someone had been subpoenaed for trial. Number three, that he was frustrated that the persons he called could not find, quote, him. And number four, that he was informing the persons he called to contact the, quote, sonny at his home to find the person. The state groups all of these together. And that grouping rests on a false premise that all the calls are related, even though there is no evidence that all the calls are related. Because we have no idea who this person was talking to on each of these calls, or if any of them talked to each other, or if any of them knew anything about the case as to what was going on. And there's no evidence specific to this case. He could have been talking about something else entirely. He also had a parole revocation hearing that week. And so there's just been no evidence from the state. And evidence that causes the jury to speculate is often more prejudicial, more harmful, than if they had had specific proof. This is further compounded by the fact that they had an opportunity to corroborate this, because Jackson was on the stand. And so if, in fact, he was being intimidated, if people were contacting him and telling him, don't come to court, or change your testimony, or don't submit it, or whatever it is they're trying to take to the stand, they could have asked him that. He was on the stand to say, has anyone contacted you about your testimony today? Has anyone tried to stop you from coming to court? They could have corroborated this in some way, and they didn't. Because it wasn't true. These calls are certainly more vague than the information that was in people in Hofstadter, which I discussed in my briefs. In that case, it was a woman who was a bywitness to a conversation between the defendant and the co-defendant, in which one of them said, do you want to get rid of Tina, who was the only occurrence witness in the case? And the other one said, I'm not worried about Tina. And the court in that case said that was too vague. That was not evidence of the consciousness of guilt, despite discussing the specific witness and saying, do you want to get rid of her? So in this case, where there's no mention of Mr. Jackson's name, there's no mention of any of the specifics of the crime, there's no idea of who the other people are or if they have any idea what's going on in this case or who was involved in the case, certainly those calls are too vague to be relevant. And I would submit that they are much more prejudicial than appropriate. Now, the state asks in their brief, how could a jury be convinced to convict someone just based on someone asking for some money and using some nasty language and some phone calls? And that's true. If all the jury had heard was these phone calls, they would have convicted them and that would have been better. What the jury heard was closely balanced evidence from two competing eyewitnesses, two different stories about what happened. And the jury was asked to decide between those. And so they hear this evidence that Mr. Howell is held pre-trial, that he's in jail, which could cause them to speculate that he is somehow dangerous or could be released pre-trial, and that he's calling people and asking for money and using all kinds of derogatory terms and curse words and all kinds of other things like that. And that could tip the scales. So the question is whether it's more prejudicial than appropriate. And in this case, whether any program value was so minimal because the calls were so vague, certainly the prejudice was greater than any appropriate value. Finally, the calls were improperly admitted because they lacked the proper foundation. At trial, the state argued that they were admissible as business records. And the state has abandoned that theory now and argues that they were admissible on the side of the witness theory. There are sort of two broad requirements for any reporting, whether there's a live witness or whether there's not. One is to provide sufficient evidence of the reliability and accuracy of the reporting. And one is to identify people who are in the reporting, the voices in the reporting. If there's a live witness, they can easily say, yes, I heard this, it's an accurate representation of what I heard that day,  but then they also have to identify whose voices are in this reporting. In this case, because there wasn't a witness to it, the state had to prove the accuracy and reliability by proving the competency of the operator, the correct operation of the equipment, all of those sort of other foundational requirements, and it also had to identify the speakers. But they only offered evidence of one of the speakers and not the others. That doesn't comply with the sound witness theory. That's not sufficient to have laid the proper foundation for the phone calls. And so they were improperly admitted without that foundation. This error also was not harmless. The state argued in closing that it was evidence of Cowell's guilty mind, but he knows he committed this offense based on what she's speculating was in these calls. So that was certainly something the state argued. They relied on it in their closing. We went to the jury. It certainly cannot be found that it was beyond a reasonable doubt that it was not harmless. And so for those reasons, we would ask that you find that the evidence was insufficient and reverse this conviction, or on the alternative, that you find the trial court error and reverse your inferred trial. Okay, thank you. We'll have rebuttal if you so desire. Thank you. Mr. Cervantes? May it please the Court. It's a pleasure to be here, Your Honor, Counsel. My name is Benjamin Zahina, representing the Court of Appeal for the Federal Prosecutor's Office. The defendant makes a number of arguments claiming that the state and the trial court failed to employ the representatory standards or evaluate the record accurately in this case. These arguments rely on a misapplication of the rule of evidence. They rely on the material misstatements of the record, and they omit relevant standards of review that this Court employs when addressing these kinds of issues. Because the state proved the defendant committed aggravated battery without justification, because all of the misstatements were properly admitted, and because the defendant's recorded phone calls were relevant and had adequate foundation, this quote should be removed. I'd like to quickly address a couple of factual issues regarding the first argument of sufficiency. Throughout the entirety of the defendant's argument, we didn't hear one thing about the standards this Court employs, as this Court is well aware. All inferences are, in the light of this, favorable to the state in this case. And there were a number of issues with the defendant's account in this case and the defendant's witnesses that would let a reasonable trial artifact conclude that the victim's account was more correct than the defendant's in this case. I'd like to point out that the witnesses, the defense witnesses in this case, also differed in their accounts of work, whether they were seated in the house, whether or not they could actually witness the attacks in this case, what the motivation was. They specifically stated that there was blood that had stained the front of the steps of the house that was visible and could not be removed, even with efforts of cleaning, one of the standards of review that was followed. They did not specifically state that. When the officer at the scene that investigated the area went up and down the street up to and including the front of 160 South Hill, where the defendant alleges the actual attack happened, there was no blood anywhere located on that area. In fact, there's no blood located on the east side of the street and on the west side of the street up to where the state asserted that this crime occurred. Did he specifically say there was no blood on the steps? Your Honor, he said that he investigated the front, that he walked both on the street and on the sidewalk in front of the steps. He said that they didn't find any blood at all around that area. I'd like to point out also that it would have been odd for the officer at that point to be looking at the house because at that point the defendant hadn't given his account of the attack that happened at that location, so he had no reason to be going onto the property, which he wasn't legally entitled to enter, you know, searching like this, even though the house was involved in this case. It tends to, though, suggest maybe he didn't look at the front of the steps. No, Your Honor, he stated that he was looking up and down the street in the areas to see if any blood had been on any side of the street where he was investigating, so to call it. So a reasonable police officer operating in this context would be to figure out where this crime occurred and verify the accounts and make sure that the crime happened related to the consent of the victim. Of course, you know, the victim at this time is a victim, but there's obviously concerns regarding evidence accounts and trying to make sure that things happen in a way that people report to the police and make sure people aren't indirectly accused of crimes like this. I'd like to point out also that both the decision in this case on the defense side had ties to the defendant in this case, obviously having an incentive to specifically state that the defendant wasn't involved in any of these crimes, and these were all brought up at trial. In addition, the last thing I'd like to note regarding specific cases related to all of this is that the defense counsel in this case did his job. Both sides are arguing that the defense counsel was somehow ineffective in how he cross-examined these witnesses and how he brought these arguments to trial. All of these things were the negative qualities that were all put in front of the jury. All of these arguments were within the mind of the trier of fact when they decided to convict the defendant of this crime. So it's not like these issues weren't present in the minds of the jury when they weighed in with the credibility of the evidence. And again, if all these inferences go in the light of the favor of the state, which is the standard that we do here, the inconsistencies in the statements, the fact that there was no blood evidence found from 400 feet from where the house was located to the location of where the state proffered that the attack actually happened, all these things go in the light of the favor of the state and weigh in favor of confirming that there's an insufficiency of the state and the evidence that the state provided. If the court can afford to postpone that, I'd like to move on to the second issue relating to Officer Lewis' testimony in the case. So Officer Lewis' testimony was either not an opinion or an opinion that wasn't made in the testimony and therefore admissible and was not a property of the court. The defendant applies an incorrect standard of the bargaining adventure rulings in this case and misstates the state's basis for admitting these statements. And because this testimony both assisted the jury and was not part of the scientific case, it should have been admitted and was corrected in that office. The state, the trial court didn't abuse its discretion in admitting these statements because, again, they met all the requirements necessarily for the misdemeanor testimony. The officer specifically was asked to compare the blood droppings at the location that he personally observed and compare them to the exhibits that were presented to the jury. This is helpful for the jury in order to find what is a difficult case to observe simply from picture evidence. It wasn't something that could be easily determined just solely from picture evidence. And his specific statements assisted the jury in coming to the conclusion that they had. So since the relative size and freshness of the bloodstains is also difficult to tell from the pictures, and this court can obviously view the exhibits as well as it has, seeing that it is kind of difficult to tell what relative size differences look like just simply from the picture, that this obviously helped the jury in determining the relevance and in coming to their ultimate conclusion of the case. The defense rests a lot of its argument on the specialized knowledge and training aspect of this, comparing this to blood pattern analysis. I had two responses to that. The first is, this kind of opinion is not something that's outside of the scope. It's not within the scope of blood pattern analysis. It's much more close to what a lay person would be able to consider simply from their own experience in life. Your Honors and everyone in this courtroom has experienced injury before. We can tell what relative size, color, and what something looks like in freshness in terms of an injury because we all experience it on a daily basis. And the fact remains that this wasn't the kind of blood pattern analysis that the defendant claims it was because that kind of analysis refers to things that can definitively opine on specific statements like whether or not the defendant was actually fighting back when the victim was actually fighting back when the attack happened or where people were specifically located. None of that is at issue in this case. All officers who it's specifically testified to was that it was a fresh injury. And I'd also like to point out that that specific line is the only relevant line in this case that the defense challenges. So when it comes to evaluating the homicidalized error, life-threatened injury is the only thing that's kind of challenged in the whole record. This challenged any of the pictures that were admitted, any of the testimony of the officers that did the investigation. None of those things are contested by the defense when it comes to the jury's ultimate determination that the evidence was before the floor. If the court has no questions on that front, I'd like to just address quickly the foundation and the relevance of phone calls in this case. Defendant's statements and several phone calls can easily be construed as attempts to commit witness intimidation or to try to prevent a witness from testifying in this case. First, they were relevant and not overly prejudicial. As evidence indicating consciousness of guilt, defendants' jailhouse phone calls indicate that he was conscious that he had committed a crime and was attempting to lay a criminal penalty for his crimes. The phone calls themselves include numerous references to someone who's been subpoenaed for the trial on Monday and refers specifically to the trial date, obviously excluding the idea that this was on a harm-related probation plan. These statements refer to having to get him and deal with him and handle the business. In these phone calls, defendant is, at a higher rate on the phone, trying to berate these people to get off their hinds and go and deal with this problem that he has. This simply isn't a case where one could listen to these phone calls and think that there was a less than innocent explanation for what defense motivations were to call on these people and attempting to get them to deal with the business that he was trying to identify. Defendant claims that the United States offered no evidence to corroborate these insinuations made on the phone calls and that it analogizes it to the case in Hofstadter. The main problem with the Hofstadter case is that it actually cuts against the defendant's conclusion because in Hofstadter, the issue was that there was a third-party witness who overheard defendant's statements to his co-conspirator regarding whether or not to eliminate or, in vague terms, get rid of a witness who was an insinuation statement. And the city attempted to include her testimony as an exception, as an implied admission, under the hearsay. And the problem with that argument is that, one, this isn't hearsay. The defendant made these phone calls. He's the one on the phone. He's the one making the statements. Therefore, it doesn't even fit under the exception. But even within that, if you read the Hofstadter opinion, relevance is assumed within Hofstadter because if not, you don't even get to the implied admission part. Because if the testimony was irrelevant, why are we trying to evaluate whether or not it is an exception to the hearsay? So the court, if you read the Hofstadter opinion, never mentions relevance. It never mentions whether or not these opinions were too vague to be relevant. They were trying to figure out whether or not it fits under the implied admission theory, which requires specific statements of crimes and evidence within those statements in order to provide an indicator of reliability that then surpasses the general arguments hearsay. So that case is completely irrelevant and should be used by this court as some way of measuring the relevance of these statements. And finally, defendants' claims that there was insufficient foundation laid under the sound evidence theory are incorrect in this case. The state laid an appropriate foundation to admit the defendant's jailhouse phone calls. Officer Thompson stated that she worked, she was conversant with the system, that she used it regularly, that she was aware of how it operated, described how it operated, that it operated by a PIN system that was logging the phones, verified the defendant wasn't the one that made the phone calls by video evidence, comparing the time the phone calls were made to the time that the phone call was logged on the active PIN number on the phones, and was able to say that she was aware and was aware of the defendant's voice and had knowledge of this so they could identify him on the phone at the time. In this case, sufficient foundation was laid on these phone calls and under the law. The defendant thinks there's a lot of issue regarding the speaker's requirement of the sound witness theory, and has an intent to say that this didn't have sufficient foundation. I have two responses to that. The first one is the state decided in this case to lay the court that her sister was not concerned with the fact that only the speaker of the phone call that was being used against the defendant by another speaker were discussed. Her sister didn't go deeply into what the reasoning was behind that. But I think, that's my second point, that that question is answered by what purpose the foundation is. The defendant's confusing the difference between relevance and foundation. These calls are relevant if they show conscientious civility. You can establish that. Foundation is, the purpose of foundation is to make sure that the thing that the state or the party is attempting to admit is the thing that they claim it is. And the state has done that by admitting that it's the defendant's voice on these phone calls and that the system was operating accurately and that these, and by describing the system in a confident user who was able to retrieve the system and that that person was aware of that person's voice. So all those requirements are met. And it fits within the purpose of foundation that these other calls don't necessarily have to be identified if it's only being used against the speaker on the phone calls. So if the court has no further questions, we would ask that you confirm on the law for your answer. I see no questions. Thank you. Any rebuttal? I wanted to address the state's argument about the standard of review for the sufficiency argument. It is true that the court reviews the facts with inferences in light of what's favorable to the state. But that doesn't mean, that means all of the evidence. That doesn't just mean the state's evidence. We use all of the evidence in the case, including the defendant's evidence, and ask whether any rational trier would come to a conclusion. So the state doesn't really answer any of these discrepancies in their evidence or any of these inconsistencies in Jackson's testimony or how his story makes any sense. They simply say, well, the trier of fact found that it was sufficient, so we just have to go along with that as we review in light of what's favorable to the state. In light of what's favorable to the state, it doesn't require this court to speculate. And there was insufficient evidence here where Jackson's story was irrational. I want to address their argument about the blood on the steps. I think, as Your Honor pointed out, there was no testimony from any of the officers that they actually went out to this house. And as the state pointed out, there was no reason for the two, because he wasn't arrested until two weeks later to give his story. So the state's argument that there was no blood found on the steps is not consistent with the record. Second, I want to move to Lewis's testimony. The state argues that we didn't challenge any of the other evidence, and we only challenged this one opinion. Well, that's because that's what his opinion was. That's the problematic evidence. And I think I explained in my first argument how that was important. Because even though it's just one section of his testimony, in the context of the trial as a whole, including how the state used his opinion in closing, it was prejudicial. And finally, with regard to the phone calls, again, the state can't point to any specific plan. Anything that they are asking in the trial or fact will be scorched and deleted requires the court to speculate about what was happening in those phone calls. And so given that, the call should have been not played for the jury, not a data trial. And again, we would ask you to reverse these trials if you wish. OK. Thanks to both of you. The case is submitted. And the court stays in recess.